UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DESOTO CAB COMPANY, INC., | Case No.  15-cv-04375-EMC |
| Plaintiff, | |
| v. | **ORDER DENYING DEFENDANTS' MOTION TO DISMISS** |
| MICHAEL PICKER, et al., | Docket No. 31 |
| Defendants. | |

Plaintiff Desoto Cab Company, Inc., d/b/a Flywheel Taxi ("Flywheel"), has filed a suit for declaratory and injunctive relief against the Commissioners of the California Public Utilities Commission ("CPUC"), in their official capacities only.  Flywheel, a "traditional" taxi company, asserts a § 1983 equal protection claim against the CPUC based on its assertion of jurisdiction over new transportation carriers such as Uber, Lyft, and Sidecar.  Flywheel contends that these so-called transportation network carriers ("TNCs")[1] are de facto taxi companies and therefore should be subject to the same rules and regulations as traditional taxi companies, which are governed not by the CPUC but rather by local municipalities such as the San Francisco Municipal Transportation Agency ("SFMTA").  The gist of Flywheel's complaint is that the CPUC's rules and regulations are less strict than the rules and regulations of, *e.g.*, the SFMTA, so that, by exercising jurisdiction to regulate TNCs and freeing them of the more demanding regulatory requirements of the SFMTA, the CPUC is affording TNCs more favorable treatment than traditional taxi companies.  According to Flywheel, because TNCs are taxi companies just like

---

[1] A TNC is "an organization . . . operating in California that provides prearranged transportation services for compensation using an online-enabled application or platform to connect passengers with drivers using a personal vehicle."  Cal. Pub. Util. Code § 5431(a).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1 │ traditional taxi companies, all should be treated equally:  all should be regulated by either local

2 │ municipalities such as the SFMTA or the CPUC.

3 │       The CPUC moved to dismiss Flywheel's complaint based on ripeness, jurisdictional, and

4 │ joinder grounds.  Having considered the parties' briefs and accompanying submissions, the Court

5 │ hereby **DENIES** the motion to dismiss.

6 │ **I.**      <u>FACTUAL & PROCEDURAL BACKGROUND</u>

7 │ A.     <u>California Public Utilities Code and CPUC Orders and Decisions</u>

8 │       Before reviewing the allegations in Flywheel's FAC, the Court first considers relevant

9 │ sections from the California Public Utilities Code and then some of the orders/decisions issued by

10 │ the CPUC regarding TNCs.[2]

11 │       Chapter 8 of the California Public Utilities Code governs "charter-party carriers of

12 │ passengers."  "'[C]harter-party carrier of passengers' means every person engaged in the

13 │ transportation of persons by motor vehicle for compensation, whether in common or contract

14 │ carriage, over any public highway in this state."  Cal. Pub. Util. Code § 5360.  Charter-party

15 │ carriers of passengers are required to "operate on a prearranged basis"; "prearranged basis" means

16 │ "the transportation of the prospective passenger was arranged with the carrier by the passenger, or

17 │ a representative of the passenger, either by written contract or telephone."  *Id.* § 5360.5; *see also*

18 │ *id.* § 5381.5(a) (providing that the CPUC must "ensure that every charter-party carrier of

19 │ passengers operates on a prearranged basis within the state").  The distinction between charter-

20 │ party carriers and traditional taxi companies seems to turn on this concept of "prearranged."

21 │ Traditional taxicabs can provide an on-demand service – *i.e.*, they can be hailed in the street – and

22 │ therefore there is no prearrangement.  Charter-party carriers, in contrast, may not be hailed in the

23 │ street.

24 │       The CPUC has the authority to "supervise and regulate every charter-party carrier of

25 │ _____

26 │ [2] The CPUC has asked the Court to take judicial notice of certain orders and decisions issued by
the CPUC.  Flywheel does not object to the Court taking judicial notice of the existence of these

27 │ documents and the statements contained therein but does object to the Court taking judicial notice
of any purported facts contained therein.  *See* Docket No. 36 (objections).  Flywheel's objection is,

28 │ in essence, moot because the Court can resolve the motion without taking judicial notice of any
facts contained therein.

1  passengers in the State." *Id.* § 5381; *see also* Cal. Const., art. XII, § 4 (providing that the CPUC

2  "may fix rates and establish rules for the transportation of passengers").  Chapter 8, however, does

3  not apply to "[t]axicab transportation service licensed and regulated by a city or county," Cal. Pub.

4  Util. Code § 5353(g), or to "transportation service . . . rendered wholly within the corporate limits

5  of a single city or city and county and licensed and regulated by ordinance."  *Id.* § 5353.5; *see also*

6  *id.* § 5353(a) (providing the same); Cal. Gov't Code § 53075.5 (providing that, "[n]otwithstanding

7  Chapter 8 (commencing with Section 5351) of Division 2 of the Public Utilities Code, every city

8  or county shall protect the public health, safety, and welfare by adopting an ordinance or

9  resolution in regard to taxicab transportation service rendered in vehicles designed for carrying not

10  more than eight persons, excluding the driver, which is operated within the jurisdiction of the city

11  or county").

12  In December 2012, the CPUC issued an order instituting rulemaking related to TNCs.  *See*

13  *generally* Docket No. 22 (Ex. A) (order instituting rulemaking ("OIR")).  The CPUC's order took

14  note of the new business model being used by TNCs such as Uber, Lyft, and Sidecar and

15  expressed concern about the potential impact of these companies on public safety.  The CPUC

16  sought comment on various issues, including not only safety and insurance but also "how the

17  Commission's existing jurisdiction . . . should be applied to businesses like Uber, Sidecar, and

18  Lyft."  Docket No. 22 (Ex. A) (OIR at 6); *see also* Docket No. 22 (Ex. A) (OIR at 10)

19  (summarizing issues for which comment was sought).

20  In September 2013, the CPUC issued a decision adopting rules and regulations related to

21  TNCs.  This decision shall hereinafter be referred to as the Phase I decision.  *See generally* Docket

22  No. 22 (Ex. B) (Phase I decision).

23  With respect to the issue of the CPUC's jurisdiction over TNCs, the Phase I decision stated

24  as follows:

25  > California law currently recognizes and regulates three modes of
> passenger transportation for compensation: taxi services, regulated

26  > by cities and/or counties; and charter-party carrier services, and
> passenger-stage companies, regulated by the Commission.  In recent

27  > years, the communications revolution in wireless service,
> smartphones, and on-line apps has further facilitated the

28  > development and adoption of passenger transportation for

United States District Court
For the Northern District of California

> compensation to a point where passengers seeking rides can be
> readily connected with drivers willing to provide rides in private
> vehicles.  This development in passenger transportation for
> compensation, referred to in this proceeding as TNCs and associated
> with companies including UberX, Lyft, and Sidecar, does not fit
> neatly into the conventional understandings of either taxis or
> limousines, but that does not mean that this Commission's
> responsibility to public safety in the transportation industry should
> be ignored and/or left for individual companies or the market place
> to control.

Docket No. 22 (Ex. B) (Phase I Decision at 11-12).

Accordingly, in the Phase I decision, the CPUC set certain rules and regulations for each

TNC – *e.g.*, "we require each TNC (not the individual drivers) to obtain a permit from the

California Public Utilities Commission (Commission), require criminal background checks for

each driver, establish a driver training program, implement a zero-tolerance policy on drugs and

alcohol, and require insurance coverage."  Docket No. 22 (Ex. B) (Phase I Decision at 3).

The Phase I decision, however, did not foreclose further rules and regulations applicable to

TNCs.  Indeed, the decision ordered

> a second phase to this proceeding to review the Commission's
> existing regulations over limousines and other charter-party carriers
> to ensure that the public safety rules are up to date, and that the rules
> are responsive to the needs of today's transportation market.  In
> addition, the second phase will consider the potential impact of any
> legislative changes that could affect our ability to regulate the TNC
> industry.  When the second phase is complete, the Commission will
> initiate the Commission's resolution process to update the General
> Order (GO) 115 and 157 series to include the new regulations
> relating to the charter-party carrier subclass of TNC.

Docket No. 22 (Ex. B) (Phase I Decision at 3); *see also* Docket No. 22 (Ex. B) (Phase I Decision

at 74) (discussing the same).

In January 2016, the CPUC issued a proposed decision on, *inter alia*, the Phase II issues

identified in its Phase I decision.  *See generally* Docket No. 22 (Ex. D) (Prop. Phase II Decision).

Several months later, in April 2016 (*i.e.*, after the Commissioners filed the motion to dismiss but

before Flywheel filed its opposition thereto), the CPUC issued its Phase II decision.  *See generally*

Docket No. 42 (Ex. J) (Phase II Decision).  One of the CPUC's rulings was that "every TNC shall

certify . . . the nature of their operations, and shall also certify how the fares are calculated."

Docket No. 42 (Ex. J) (CPUC Decision at 4).  Also, the Phase II decision addressed fare splitting

1    by TNCs.  *See* Docket No. 42 (Ex. J) (Phase II Decision at 4, 45) (stating that such fare-splitting

2    operations "are permitted, subject to certain conditions"); Docket No. 42 (Ex. J) (Phase II

3    Decision at 9 n.3) (noting use of the term "fare splitting" instead of "ride-sharing" as it was a more

4    accurate representation of the service).  The CPUC also stated in its decision that additional issues

5    would be considered in a Phase III proceeding.  *See* Docket No. 42 (Ex. J) (Phase II Decision at

6    5).

7    B.    <u>Flywheel's Pleading</u>

8        Having reviewed the CPUC orders and decisions, the Court now turns to Flywheel's

9    pleading.  In its first amended complaint ("FAC"), Flywheel alleges as follows.

10        Flywheel is "a taxi company that operates on-demand transportation services in the City

11    and County of San Francisco."  FAC ¶ 13.  As a traditional taxi company, Flywheel is regulated

12    by the San Francisco Municipal Transportation Agency ("SFMTA") and not the CPUC.  *See* FAC

13    ¶¶ 11-12.

14        "In October 2012, the SFMTA exercised jurisdiction over UberX, Lyft and Sidecar and

15    began to regulate them as taxi companies."  FAC ¶ 20.  However, some two months later (*i.e.*, in

16    December 2012), the CPUC instituted a rulemaking process to assess how companies such as

17    UberX, Lyft, and Sidecar should be regulated.  *See* FAC ¶ 21.  The exercise of authority by the

18    CPUC appears to have removed the power of regulating TNCs from the SFMTA, and vested it in

19    the CPUC.

20        In September 2013, the CPUC issued its Phase I decision in which it adopted rules and

21    regulations that govern TNCs specifically.  *See* FAC ¶ 23.

22        According to Flywheel, TNCs are just like traditional taxi companies because both offer

23    "on-demand private ground transportation services."  FAC ¶ 27.  Flywheel implicitly takes the

24    position that hailing a TNC car through a smart phone is just like making an on-street hail.  *See*

25    FAC ¶ 27 (alleging that on-demand services are provided "with rides summoned through street or

26    smart-phone hails").  Flywheel also points out that many traditional taxi companies, including

27    itself, also provide transportation services through the use of smart phones.  See FAC ¶ 28 (noting

28    that traditional taxi companies also "arrange transportation services using smart phone

**United States District Court**
For the Northern District of California

applications on telecommunications hardware devices that rely on global positioning system location technology to offer transportation services"; adding that Flywheel "receives 30,000 service requests per month through smart phone applications").

Because, in Flywheel's view, there are no material differences between a traditional taxi company and a TNC, the same rules and regulations should apply to both, but the CPUC's rules and regulations which apply to TNCs are less strict than the rules and regulations promulgated by local municipalities for taxi companies.  For example:

- "The CPUC requires liability insurance at levels far below the minimum requirements for taxi companies in San Francisco."  FAC ¶ 34.

- "The CPUC has never required [TNCs] to maintain workers' compensation insurance for drivers.  In contrast, taxi companies in San Francisco are required to maintain workers compensation insurance for all drivers."  FAC ¶ 35.

- "The CPUC adopted an annual licensing fee for [TNCs] that is unrelated to the number of vehicles in the company's fleet and is far below the fees charged to taxi companies in San Francisco.  San Francisco taxi companies are required to associate each and every taxi with a medallion, for which taxi companies must pay a monthly fee of approximately $1000 to $2000 per month.  In additional, San Francisco taxi companies must pay annual permit fees of up to $17,000 per year and annual device registration fees of up to $30,000 annually."  FAC ¶ 36.

- "The CPUC does not limit the number of vehicles that [TNCs] may operate in California, including within the city and count limits of San Francisco . . . . By contrast, the number of taxis in San Francisco is limited to 1,900."  FAC ¶ 37.

- "The CPUC does not establish or provide[] guidance as to the rates charged by [TNCs].  All [TNCs] are free to set their own rates . . . . In contrast, San Francisco taxi companies are restricted in the rates that passengers may be charged."  FAC ¶ 38.

More differences are identified in FAC ¶¶ 39-41.  According to Flywheel, "[t]he result is significantly higher costs for tax companies in San Francisco" and/or "reduced protection for members of the public using [TNC] services."  FAC ¶ 34.

1   Flywheel asserts that, "by exercising jurisdiction over some, but not all, on-demand ground

2   transportation services [*i.e.*, services from TNCs but not services from taxi companies]," the

3   CPUC has violated its right to equal protection.  FAC ¶ 49.  Flywheel "seeks a judicial declaration

4   that the CPUC's September . . . 2013 Decision [*i.e.*, the Phase I decision] is unlawful, an

5   injunction enjoining the CPUC from exercising jurisdiction over [TNCs] or, in the alternative,

6   requiring that the CPUC exercise jurisdiction over all taxi companies in California."  FAC ¶ 57.

7                           **II.     DISCUSSION**

8   A.     Johnson Act

9         In its motion, the CPUC argues first that dismissal is warranted because this Court lacks

10  jurisdiction over the case, more specifically, based on the Johnson Act.  "The Johnson Act

11  withdraws state utility rate cases from federal jurisdiction when certain conditions are met."  *US*

12  *West, Inc. v. Nelson*, 146 F.3d 718, 721 (9th Cir. 1998).  The purposes underlying the Act include

13  (1) "to prevent forum-shopping by utilities between State and Federal courts" and (2) "to effect a

14  'general hands-off policy relative to state rate making.'"  *Tennyson v. Gas Serv. Co.*, 506 F.2d

15  1135, 1138 (10th Cir. 1974) (adding that "[b]ehind the Act were years of hostilities generated

16  from jurisdiction in both the state and federal systems, removal of which was deemed desirable to

17  the national policy"); *see also Municipal Elec. Utils. v. Power Auth. of N.Y.*, No. 80 Civ. 1149

18  (RLC), 1981 U.S. Dist. LEXIS 9617, at *5 (S.D.N.Y. Apr. 15, 1981) (stating that "[t]he legislative

19  history surrounding passage of the Act in 1934 reveals that Congress was concerned with privately

20  owned utilities challenging orders of separate governmental ratemaking authorities").

21        The Johnson Act, codified at 28 U.S.C. § 1342, provides as follows:

22            The district courts shall not enjoin, suspend or restrain the operation
              of, or compliance with, any **order affecting rates** chargeable by a

23            **public utility** and made by a State administrative agency or a rate-
              making body of a State political subdivision, where:

24

25            (1)     Jurisdiction is based solely on diversity of citizenship or
                      repugnance of the order to the Federal Constitution; and,

26            (2)     The order does not **interfere with interstate commerce**;
                      and,

27

28            (3)     The order has been made after **reasonable notice and
                      hearing**; and,

1

        (4)       A plain, speedy and efficient remedy may be had in the
courts of such State.

2

3    28 U.S.C. § 1342 (emphasis added).  The language bolded above reflects the bases of Flywheel's

4    arguments as to why the Johnson Act does not apply to the instant case.  However, "[t]he burden

5    of showing that the [above] conditions have been met is on the party invoking the Johnson Act,"

6    *US West v. Nelson*, 146 F.3d at 722 – here, the CPUC.

7          As an initial matter, the Court notes that some of Flywheel's arguments are problematic.

8    For example, Flywheel essentially conceded at the hearing that TNCs are, in fact, public utilities

9    within the meaning of the Johnson Act.  *See Munn v. Illinois*, 94 U.S. 113, 126, 129 (1876) (noting

10    that the government's power to regulate private property arises when the private property "is

11    'affected with a public interest'"; adding that this principle is the source of "the power to regulate

12    the charges of common carriers" – "[c]ommon carriers exercise a sort of public office, and have

13    duties to perform in which the public is interested" and so "[t]heir business is . . . 'affected with a

14    public interest'").  *Cf. Terminal Taxicab Co., Inc. v. Kutz*, 241 U.S. 252, 253-54 (1916)

15    (considering a federal statute that created a public utilities commission for the District of

16    Columbia; concluding that the plaintiff-taxicab company was a public utility and a common

17    carrier within the meaning of the statute); *Doe v. Uber Technologies, Inc.*, No. 15-cv-04670-SI,

18    2016 U.S. Dist. LEXIS 60051 (N.D. Cal. May 4, 2016) (holding that Uber is a common carrier

19    under California law).

20          Flywheel's argument that the CPUC's Phase I decision interferes with interstate commerce

21    is also problematic.  Flywheel argues that there is interference with interstate commerce "due to

22    the simple fact that the drivers of [TNCs] transport passengers across state lines" and "it is clear

23    that [TNCs] regularly transport passengers from California to other states and, likely, passengers

24    from other states back to California."  Opp'n at 7 (asking the Court to take judicial notice of an

25    Uber website showing that a ride can originate in Northstar (California) and end in Reno

26    (Nevada)).  But even if the Court could take judicial notice of the Uber website identified by

27    Flywheel (and it is questionable whether the Court could, *see* Fed. R. Evid. 201(b)), that document

28    simply shows that TNCs do engage in some interstate commerce.  But the mere fact that TNCs

8

*engage* in interstate commerce is not enough to establish *interference* with interstate commerce. As the Tenth Circuit noted in *US West Inc. v. Tristani*, 182 F.3d 1202 (10th Cir. 1999), there mere "fact that Yellow Pages publishing and advertising takes place in interstate commerce does not itself lead to the conclusion that the rate order interferes with interstate commerce"; "[i]nterference requires more than an incidental effect on interstate commerce" *Id.* at 1210-11; *see also US West v. Nelson*, 146 F.3d at 724 (stating that, "under the wording of the Johnson Act, it is not enough that an intra-state rate-making policy merely 'affect' interstate commerce[;] [u]nless the effects of the policy amount to interference, the Johnson Act bars federal jurisdiction"). *Compare, e.g.*, *Public Utils.*, 317 U.S. at 469-70 (holding that the "the orders of the state Commission 'interfere with interstate commerce' to the extent that they constitute an attempt to regulate matters in interstate commerce which Congress has lodged exclusively with the Federal Power Commission"); *Tri-State Gen. & Trans. Ass'n v. Pub. Serv. Comm'n*, 412 F.2d 115, 118 (10th Cir. 1969) (expressing concern over "the directives and orders of the Commission which have effectively prevented the Wyoming utilities from paying their contract obligations to [the plaintiff] Tri-State[;] [t]his Commission action patently had the potential of interfering with interstate commerce and supports jurisdiction under 28 U.S.C. § 1342(2)").

Notwithstanding the above, the Court ultimately rules in Flywheel's favor because of another Johnson Act requirement – *i.e.*, the requirement that the challenged agency action be an order affecting rates. As Flywheel contends, here, it is not challenging an "order affecting rates" as that phrase is used in the Johnson Act.

In so ruling, the Court begins by taking note that Flywheel is *not* challenging the CPUC's Phase II decision. Flywheel expressly disavowed such a challenge at the hearing on the motion to dismiss, which is not surprising given there is a much stronger argument that the Phase II decision is such an order – *e.g.*, the Phase II decision requires TNCs to "certify how the fares are calculated." Docket No. 42 (Ex. J) (CPUC Decision at 4). Also, the Phase II decision addresses fare splitting by TNCs.[3]

---

[3] The Court, however, does not pass on the question whether Phase II is sufficiently directed to rates as to fall under the Johnson Act.

United States District Court
For the Northern District of California

1    But just because the Phase II decision is or may be an order affecting rates does not mean

2    that the Phase I decision is such an order.  Indeed, Phase I does not have any direct bearing on

3    rates at all.

4    Admittedly, Flywheel has alleged that, in the Phase I decision, "[t]he CPUC does not

5    establish or provide[] guidance as to the rates charged by [TNCs].  All [TNCs] are free to set their

6    own rates."  FAC ¶ 38.  But this allegation does not transform Phase I into an order affecting rates.

7    The CPUC's failure to set or address rates in the Phase I decision cannot fairly be deemed an

8    "order affecting rates."  Lack of action regarding rates cannot be deemed an order affecting rates

9    simply because the agency asserting jurisdiction might have the potential power to set or regulate

10   rates.  At least, the CPUC has cited no case so holding.[4]

11   The CPUC argues still that the Phase I decision has an indirect impact on rates which make

12   it an order affecting rates.  More specifically, the CPUC asserts that the Phase I decision's rules

13   on, *e.g.*, insurance and workers' compensation "necessarily affect the TNCs' rates, because they

14   all either impose costs on the TNCs or shift their recovery.  It is axiomatic that a utility's costs are

15   reflected in its rates . . . ."  Mot. at 10.  But, similar to above, such an argument has no limits;

16   under this construction, practically any administrative agency order could be deemed an order

17   affecting rates by affecting the cost of operating, be it setting workers compensation requirements

18   and/or gas prices, wages, or income tax rates.  Although the Ninth Circuit has noted that the

19   _____

20   [4] The CPUC has pointed to *US West*, where the Ninth Circuit used language referring to
     encroachment on rate-setting authority.  *See US West*, 146 F.3d at 722 ("The threshold inquiry is

21   whether the complaint challenges any Commission 'order affecting rates.'  It does not do so if the
     US West companies can state a federal claim – and be entitled to relief – without encroaching on

22   the Commission's orders and rate-setting authority.)  But *US West* must be read based on the
     specific facts animating that decision.  There,

23
                    [b]y appellants' own allegations, imputation is an accounting
24                  practice that the Commission uses *to derive intrastate
                    telecommunications rates*.  As such, it is "an integral part of the rate
25                  structures" that may not be attacked in federal court under the
                    Johnson Act.  Because imputation is a Commission procedure that
26                  cannot be separated from its substantive expression in rate orders,
                    the US West companies' challenge to imputation – however phrased
27                  – is a challenge to "any order affecting rates" as a matter of law.

28   *Id.* at 722-23 (emphasis added).

legislative history of the Johnson Act "supports a broad interpretation," *Brooks v. Sulphur Springs Valley Elec. Coop.*, 951 F.2d 1050, 1054 (9th Cir. 1991) (stating that, "[a]lthough the primary evil the Act sought to remedy was the issuance of injunctions by federal courts against enforcement of state rate orders, legislators were also more generally concerned with protecting the authority of states 'to perform their proper functions in the supervision and fixing of rates, without interference of Federal law'"), the Johnson Act should be so broadly construed that its application would be virtually unlimited, insulating nearly any agency action – even those with a remote and indirect effect on ultimate consumer prices – from federal court review.  Implicitly recognizing such, the CPUC conceded, at the hearing, that its position was, at best, on the outer limits of the Johnson Act's applicability.

*Hill v. Kansas Gas Service Co.*, 323 F.3d 858 (10th Cir. 2003), is not to the contrary. There, the plaintiffs asserted that certain refunds that the public utilities received from natural gas producers and/or interstate pipelines (after a federal agency ruling regarding taxes) should have been refunded to them and to other customers of the public utilities.  The utilities had instead – pursuant to a state agency order – distributed the refunds to low-income customers only via bill credits to their accounts.  *See id.* at 862.  The plaintiffs argued that the challenged orders of the state agency were not "orders affecting rates" for purposes of the Johnson Act because

> "'there was no change made or sought to tariffs and there was no increase or decrease ordered or sought in the rates that the defendants charge their customers. . . . There was merely a mechanism established outside the rates and tariffs to credit[] select low income customers' bills [*i.e.*, rather than refund the money to all customers] . . . . The rates for utility service were not modified at all.'"

*Id.* at 864.  The Tenth Circuit disagreed, stating that "[c]onsideration of how the refunds would have been distributed in the absence of the challenged orders makes it clear that the [state agency's] order affected rates for purposes of § 1342."  *Id.*  That is, "[h]ad the [state agency] not elected to alter the manner in which the refunds would be distributed under the PGA [Purchased Gas Adjustment] clauses, Defendants' cost of gas would have decreased due to the refund-based negative adjustment, which would have translated into a decrease in the per unit price of gas paid by Defendants' retail customers."  *Id.* at 865.  The state agency order thus *directly* impacted rates

United States District Court
For the Northern District of California

1  payable by the utilities' consumers. *See also Wheelabrator Lisbon, Inc. v. Conn. Dep't of Pub.*

2  *Util. Conn. Dep't of Pub. Util. Control*, 526 F. Supp. 2d 295, 302 (D. Conn. 2006) (noting that the

3  revenue that Connecticut Light & Power received from the sale of certain renewable energy

4  certificates would be credited to customers through the Competitive Transition Assessment

5  component of the customers' bills; stating that, "[a]lthough the Competitive Transition

6  Assessment component of a customer's bill is not strictly the 'rate' charged by CL&P, the Johnson

7  Act's bar extends to such indirect effects on rates").

8          The instant case is distinguishable from *Hill* because, here, the costs of operating a TNC

9  have no direct connection to the rates a TNC charges. Unlike a refund to customer, a TNC's

10 operational costs have only a remote, indirect impact on rates.

11         The CPUC contends still that the Phase I decision must be considered an order affecting

12 rates because the Phase II decision is (as Flywheel seems to concede) an order affecting rates and,

13 if the CPUC's Phase I decision to exercise jurisdiction is invalidated by Flywheel, then that

14 necessarily invalidates the Phase II decision. *Cf. US West*, 146 F.3d at 723 (stating that, "[e]ven if

15 the complaint accurately could be characterized as seeking to enjoin the Commission only from

16 calculating *future* rate orders using the imputation accounting method, future rate orders are a

17 subset of the larger set comprising 'any order affecting rates'") (emphasis in original). The Court,

18 however, is not persuaded by this argument.

19         First, to the extent Flywheel is challenging the larger act of the CPUC's exercise of

20 jurisdiction over TNCs but not taxi companies, that challenged act affects a wide range of

21 regulations that do not pertain to the setting of rates (such as requirements for background checks

22 and insurance coverage). In effect, Flywheel is challenging the general jurisdictional reach of the

23 CPUC which is a "procedure that exists apart from the rate-making system." *US West v. Nelson*,

24 146 F.3d at 722. Such a general challenge vastly transcends the kind of agency rate-setting that

25 was the specific focus of the Johnson Act.

26         Moreover, since the CPUC's exercise of jurisdiction over TNCs, but not taxi companies, is

27 based on a California statute, *see* Cal. Pub. Util. Code § 5381 (providing that the CPUC has the

28

12

authority to "supervise and regulate every charter-party carrier of passengers in the State"),[5] the Eighth Circuit's decision in *Minnesota Gas Co. v. Public Service Commission*, 523 F.2d 581 (8th Cir. 1975), is instructive.  In *Minnesota Gas*, a local gas company filed a lawsuit seeking a declaration that "a recently enacted Minnesota statute is unconstitutional as it purports to permit a state agency to prescribe utility rates different from those set out in a preexisting utility franchise contract between [the plaintiff] and the City of Minneapolis."  *Id.* at 582.  In a footnote, the Eighth Circuit explained that the Johnson Act was not a concern because the plaintiff was not

> challenging a particular administrative *order affecting rates* but rather a *Minnesota statute* asserting the power to regulate in general. Where the constitutional challenge is to the State's power to regulate *per se* rather than to the procedural and substantive fairness of an administrative order, the Johnson Act has been held inapplicable.

*Id.* at 582 n.1 (emphasis in original; citing *Public Util. Comm'n v. United States*, 355 U.S. 534, 540 (1958)); *see also Public Utils.*, 355 U.S. at 536, 540 (noting that the United States asked that a provision in the California Public Utilities Code "be declared unconstitutional insofar as it prohibits carriers from transporting government property at rates other than those approved by the Commission"; stating that "[t]he United States wants to be rid of the system that subjects its procurement services to that form of state supervision").

Finally, Flywheel's challenge and relief sought is phrased in the alternative.  Its complaint seeks as an alternative to have the CPUC exercise jurisdiction over taxi companies as wells as TNCs.  *See* FAC ¶ 57 (seeking an alternative relief CPUC's exercise of jurisdiction over all taxi companies in California).  Thus, Flywheel does not necessarily seek to invalidate Phase I decision (and as a consequence, the Phase II decision).

Accordingly, for the reasons stated above, the Court concludes that the Johnson Act is not a bar to Flywheel's lawsuit, because the CPUC's Phase I decision is not an "order affecting rates" as that phrase is used in the Johnson Act.

B.    Ripeness

The CPUC asserts that, aside from jurisdiction, there is another problem with Flywheel's

---

[5] *See also* Cal. Const., art. XII, § 4 (providing that the CPUC "may fix rates and establish rules for the transportation of passengers").

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   case, namely, it is not ripe for review because "[a]ll of the substantive regulations about which

2   [Flywheel] complains remain in play before the CPUC and are subject to change"; the regulations

3   "are not yet 'at an administrative resting place.'"  Mot. at 13 (quoting *Citizens for Better Forestry*

4   *v. U.S. Dep't of Agric.*, 341 F.3d 961, 977 (9th Cir. 2003)).

5          It is not clear from its papers whether the CPUC's ripeness argument is predicated on

6   Article III or prudential considerations.  *See Guatay Christian Fellowship v. County of San Diego*,

7   670 F.3d 957, 980 (9th Cir. 2011) (noting that ripeness is drawn both from Article III limitations

8   on judicial power and from prudential reasons for refusing to exercise jurisdiction; Article III is a

9   jurisdictional matter while prudential concerns are discretionary).  Nevertheless, in either situation,

> the ripeness requirement is designed to prevent the courts, through
> avoidance of premature adjudication, from entangling themselves in
> abstract disagreements over administrative policies, and also to
> protect the agencies from judicial interference until an
> administrative decision has been formalized and its effects felt in a
> concrete way by the challenging parties.
>
> In deciding whether an agency's decision is, or is not, ripe for
> judicial review, the [Supreme] Court has examined both the "fitness
> of the issues for judicial decision" and the "hardship to the parties of
> withholding court consideration."

16   *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (internal quotation marks

17   omitted).  Consideration of fitness of the issues for judicial decision includes consideration of

18   "whether judicial intervention would inappropriately interfere with further administrative action;

19   and . . . whether the courts would benefit from further factual development of the issues

20   presented."  *Id.* at 733.

21          Given the above standard, the CPUC's position is weak.  Even if all of the regulations have

22   not been hammered out as of yet, it is not clear why Flywheel cannot move forward with its

23   challenge to what has been done so far – including, *e.g.*, insurance rules – especially as there is no

24   indication that the CPUC will backtrack on any regulations regarding TNCs that it has

25   promulgated so far.  Moreover, under the CPUC's position, it would appear that the agency would

26   have to have finalized all regulations on TNCs before it would be appropriate for Flywheel to

27   bring suit.  There is increased hardship to Flywheel the longer it has to wait for all regulations to

28   be finalized, and nothing in the record indicates how quickly the CPUC will move on finalizing all

United States District Court
For the Northern District of California

1    TNC regulations (*e.g.*, Phase III seems to be currently under consideration).  Finally, the Court

2    notes that, ultimately, what Flywheel is contesting here is an overall scheme that differentiates

3    between regulations governing TNCs and those governing traditional taxi companies.  The

4    disparities between the two regulatory regimes are sufficiently concrete so as to permit an

5    adjudication of Flywheel's equal protection claim.  The precise details of further phases of

6    regulation is not likely to be material to Flywheel's constitutional claim.

7         The Court thus rejects the CPUC's ripeness argument.

8    B.    Joinder

9         The final argument raised by the CPUC is that dismissal is appropriate because Flywheel

10   has failed to join necessary parties – namely, all TNCs, all traditional taxicab companies, and all

11   municipalities that regulate traditional taxicab companies.  *See* Mot. at 17.  The CPUC argues that

12   inclusion of all these parties is necessary (in spite of the potential unwieldiness of such a lawsuit)

13   in light of the specific relief requested by Flywheel – *i.e.*, either vesting jurisdiction over TNCs

14   with the municipalities (who already regulate traditional taxi companies) or vesting jurisdiction

15   over both TNCs and taxi companies with the CPUC.

16        The issue of joinder is governed by Federal Rule of Civil Procedure 19.  The CPUC

17   invokes Rule 19(a)(1)(B), asserting that "[t]he TNCs, the taxicabs, and the local regulators . . .

18   plainly have at least a 'claim' to an interest in the outcome of this proceeding."  Mot. at 17.  But

19   Rule 19(a)(1)(B) requires this Court to consider not only whether a person "claims an interest

20   relating to the subject of the action" but also whether that person "is so situated that disposing of

21   the action in the person's absence may . . . as a practical matter impair or impede the person's

22   ability to protect the interest."  Fed. R. Civ. P. 19(a)(1)(B)(i).

23        The CPUC has the burden of showing Rule 19 requires joinder.  *See Brum v. Cty. of*

24   *Merced*, No. 1:12-cv-01636-AWI-KSO, 2013 U.S. Dist. LEXIS 77026, at *11 (E.D. Cal. May 31,

25   2013) (stating that, "based on the authority in the Ninth Circuit that has analyzed the standard of

26   persuasion for a Rule 19 motion, it is Defendants' burden of persuasion, as the moving parties, to

27   establish that it is necessary to join MCSEA pursuant to Rule 19, and not Plaintiffs' burden to

28   show that MCSEA should not be joined").  The CPUC has not shown that the TNCs, traditional

United States District Court
For the Northern District of California

taxi companies, and local municipalities are so situated that disposing of this action in their absence would impair or impede their ability to protect their interests.

There is in, in effect, a binary question posed for the Court: should the CPUC regulate the TNCs or should regulation of TNCs be within the jurisdiction of local municipalities?  The TNCs, traditional taxi companies, and local municipalities will come down on one side of the issue or the other; but there is nothing to show that that side cannot be adequately represented by Flywheel or the CPUC, respectively.  Flywheel and CPUC take opposing positions on this issue.  The positions of the allegedly missing parties are represented by the parties hereto; there has been no showing to the contrary.

*White v. University of California*, 765 F.3d 1010 (9th Cir. 2014), the main case on which the CPUC relies, is not to the contrary.  There, there was a dispute over the custody of two human skeletons found at a burial site located on university property.  Native American tribes claimed the right to compel repatriation of the remains to a certain tribe.  Repatriation was opposed by university professors who wanted to study the remains.  The university professors sued the university after the university determined that it would repatriate.  The university moved to dismiss, asserting that, *inter alia*, the Native American tribes were necessary and indispensable parties to the litigation and that their joinder was not feasible because they had immunity from suit.

On appeal, the professors argued that the university could adequately represent the tribes' interests.  The Ninth Circuit disagreed:

> At present, their interests are aligned.  There is some reason to believe that they will not necessarily remain aligned.  However, as the district court pointed out, the University "has a broad obligation to serve the interests of the people of California, rather than any particular subset, such as the people of the Kumeyaay tribes."  Thus, the different motivations of the two parties could lead to a later divergence of interests.  For example, if a court were to determine that the La Jolla remains should not be transferred to the Kumeyaay under [the Native American Graves Protection and Repatriation Act], it is questionable whether – perhaps even unlikely that – the University and the Kumeyaay would pursue the same next course of action.

*Id.* at 1027.

*White* is distinguishable from the instant case because, in *White*, the Ninth Circuit identified different motivations for the university and the tribes that could lead them to act in different ways.  But here, the CPUC has not adequately identified motivations of the allegedly necessary and indispensable parties (*i.e.*, the TNCs, the traditional taxi companies, and the local municipalities) which might diverge from both Flywheel and the CPUC which would lead them to conduct themselves differently from the litigants.  For instance, the traditional taxi companies are more than likely to have the same exact motivations as Flywheel.  In the absence of such identified different motivations, the Court concludes that it is too speculative to say that the TNCs, traditional taxi companies, and local municipalities cannot be adequately represented by Flywheel and/or the CPUC.  Of course, should circumstances change, the CPUC may renew its motion to dismiss based on Rule 19 but, at least at this juncture, CPUC has not met its burden to support a dismissal based on failure to join necessary and indispensable parties.

### III.    CONCLUSION

For the foregoing reasons, the Court **DENIES** the CPUC's motion to dismiss.

This order disposes of Docket No. 31.


**IT IS SO ORDERED**.


Dated: July 20, 2016

_____
EDWARD M. CHEN
United States District Judge