UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DESOTO CAB COMPANY, INC., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL PICKER, et al., <br><br> Defendants. | Case No. 15-cv-04375-EMC <br><br> **ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** <br><br> Docket No. 53 |

Plaintiff Desoto Cab Company, Inc., d/b/a Flywheel Taxi ("Flywheel"), has filed a suit for declaratory and injunctive relief against the Commissioners of the California Public Utilities Commission ("CPUC"), in their official capacities only.[1] Flywheel, a "traditional" taxi company, asserts a § 1983 equal protection claim against the CPUC based on the agency's assertion of jurisdiction over new transportation carriers such as Uber, Lyft, and Sidecar. Flywheel contends that these so-called transportation network carriers ("TNCs") are de facto taxi companies and therefore should be subject to the same rules and regulations as traditional taxi companies, which are regulated not by the CPUC but rather by local municipalities. The gist of Flywheel's complaint is that the CPUC's rules and regulations governing TNCs are less strict than the rules and regulations of the local municipalities governing traditional taxis so that, in the final analysis, the TNCs are more favorably treated. According to Flywheel, TNCs are de facto taxi companies much like traditional taxi companies, and thus all should be regulated by local municipalities or all should be regulated by the CPUC, rather than subjected to a disparate bifurcated regime. Failure to do so, according to Flywheel, violates the Equal Protection Clause of the Fourteenth

---

[1] Because the Commissioners are being sued in their official capacities only, the Court hereinafter refers to Defendants as the CPUC.

1  Amendment.

2  Currently pending before the Court is the CPUC's motion for judgment on the pleadings,
3  or in the alternative, for summary judgment.

## I. FACTUAL & PROCEDURAL BACKGROUND

A.  Regulatory Framework

As an initial matter, the Court takes judicial notice of the following:

- Article XII, § 4 of the California Constitution provides that the CPUC "may fix rates and establish rules for the transportation of passengers." Cal. Const., art. XII, § 4.

- Article XII, § 8, of the California Constitution, provides "A city, county, or other public body may not regulate matters over which the Legislature grants regulatory power to the [CPUC]. This section does not affect power over public utilities relating to the making and enforcement of police, sanitary, and other regulations concerning municipal affairs pursuant to a city charter existing on October 10, 1911, unless that power has been revoked by the city's electors, or the right of any city to grant franchises for public utilities or other businesses on terms, conditions, and in the manner prescribed by law." Cal. Const., art. XII, § 8. The California Supreme Court has explained that, under this provision, "the powers of control over existing public utilities which were vested in any city at the time . . . are still retained by such city." *Title Guar. & Trust Co. v. Railroad Com. of Cal.*, 168 Cal. 295, 301 (1914) (discussing provision in California Constitution that was the predecessor to Article XII, § 8).

- Under the California Public Utilities Code, the CPUC "shall see that the provisions of the Constitution and statutes of this State affecting public utilities . . . are enforced and obeyed . . . ." Cal. Pub. Util. Code § 2101.

- Chapter 8 of the California Public Utilities Code governs "charter-party carriers of passengers." "'[C]harter-party carrier of passengers' means every person engaged in the transportation of persons by motor vehicle for compensation, whether in

common or contract carriage, over any public highway in this state." Cal. Pub. Util. Code § 5360. Charter-party carriers of passengers are required to "operate on a prearranged basis," with "prearranged basis" meaning that "the transportation of the prospective passenger was arranged with the carrier by the passenger, or a representative of the passenger, either by written contract or telephone." *Id.* § 5360.5.

- Under Chapter 8, the CPUC has the authority to "supervise and regulate every charter-party carrier of passengers in the State." *Id.* § 5381. Among other things, the CPUC is required to "ensure that every charter-party carrier of passengers operates on a prearranged basis within the state." *Id.* § 5381.5(a).

- Chapter 8 contains a provision that expressly states the chapter does not apply to, *inter alia*, "[t]axicab transportation service licensed and regulated by a city or county, by ordinance or resolution, rendered in vehicles designed for carrying not more than eight persons." Cal. Pub. Util. Code § 5353(g); *see also* Cal. Gov't Code § 53075.5 (providing that, "[n]otwithstanding Chapter 8 (commencing with Section 5351) of Division 2 of the Public Utilities Code, every city or county shall protect the public health, safety, and welfare by adopting an ordinance or resolution in regard to taxicab transportation service rendered in vehicles designed for carrying not more than eight persons, excluding the driver, which is operated within the jurisdiction of the city or county").[2]

Accordingly, under the state statutory framework, taxicab companies, unlike charter-party carriers of passengers, are specifically excluded from the CPUC's jurisdiction; they are regulated by cities and counties, not by the CPUC.

B. Operative Complaint

Against this backdrop, Flywheel alleges as follows in its first amended complaint ("FAC").

---

[2] *Cf.* Cal. Pub. Util. Code § 5353.5 (providing that Chapter 8 "does not apply to transportation service, other than transportation service furnished in a limousine for hire, rendered wholly within the corporate limits of a single city or city and county and licensed or regulated by ordinance").

3

Flywheel is "a taxi company that operates on-demand transportation services in the City and County of San Francisco." FAC ¶ 13. As a traditional taxi company, Flywheel is regulated by the San Francisco Municipal Transportation Agency ("SFMTA") and not the CPUC. *See* FAC ¶¶ 11-12. "The CPUC does not have jurisdiction over and cannot regulate taxi transportation services in California. City and county governments have exclusive jurisdiction over taxi transportation services in California." FAC ¶ 3.

"In October 2012, the SFMTA exercised jurisdiction over UberX, Lyft and Sidecar and began to regulate them as taxi companies." FAC ¶ 20. However, some two months later (*i.e.*, in December 2012), the CPUC instituted a rulemaking process to assess how companies such as UberX, Lyft, and Sidecar should be regulated. *See* FAC ¶ 21.

In September 2013, the CPUC issued a decision in which it adopted rules and regulations that govern TNCs (*i.e.*, the Phase I Decision), thus, implicitly asserting jurisdiction over TNCs. This created a scheme where TNCs are regulated by the CPUC whereas traditional taxi companies are regulated by local municipalities.

With respect to the issue of the CPUC's jurisdiction over TNCs, the CPUC noted as follows in its Phase I Decision:

> California law currently recognizes and regulates three modes of passenger transportation for compensation: taxi services, regulated by cities and/or counties; and charter-party carrier services, and passenger-stage companies, regulated by the Commission. In recent years, the communications revolution in wireless service, smartphones, and on-line apps has further facilitated the development and adoption of passenger transportation for compensation to a point where passengers seeking rides can be readily connected with drivers willing to provide rides in private vehicles. This development in passenger transportation for compensation, referred to in this proceeding as TNCs and associated with companies including UberX, Lyft, and Sidecar, does not fit neatly into the conventional understandings of either taxis or limousines, but that does not mean that this Commission's responsibility to public safety in the transportation industry should be ignored and/or left for individual companies or the market place to control.

Docket No. 22 (RJN, Ex. N) (Phase I Decision at 11-12).

The CPUC continued:

> We find that TNCs operate on a prearranged basis. PU Code § 5360.5 does not define "prearranged," and we are reluctant to impose a minimum time requirement as some other jurisdictions have done. Instead, we are guided by the plain meaning of "prearranged" as something arranged in advance, which has been our custom and practice in interpreting "prearranged" at the Commission. For example, our information packet for prospective TCP [Transportation Charter Party] applicants says that all transportation performed by TCPs must be arranged beforehand, and the driver must have a completed waybill in his or her possession at all times during the trip.
>
> We believe TNCs satisfy the "prearranged" requirement in two ways: first, before a passenger can request a ride, the passenger must download the app and agree to the TNC service agreement. . . . Second, for a particular trip, the passenger must input information such as a current location. A TNC driver cannot be hailed like a cab where no information is exchanged until the passenger enters the vehicle.

Docket No. 22 (Ex. N) (Phase I Decision at 20-21).[3]

In 2014, the California Legislature amended the California Public Utilities Code to include provisions on TNCs. *See* Cal. Pub. Util. Code § 5430 *et seq.*

According to Flywheel, TNCs and traditional taxi companies "are identical in all relevant respects." FAC ¶ 26. For example, both "offer and arrange transportation services using smart phone applications." FAC ¶ 28. Both also provide services "with rides summoned through street or smart-phone hails." FAC ¶ 27. Both "use a metering system based on distance and time traveled to determine the fare." FAC ¶ 30. Both use a credit card payment system. *See* FAC ¶ 31.

Because, in Flywheel's view, there are no material differences between a traditional taxi company and a TNC, the same rules and regulations should apply to both; yet the CPUC's rules and regulations which apply to TNCs (or lack thereof) are less strict than the rules and regulations promulgated by local municipalities for taxi companies.[4] *See, e.g.*, FAC ¶ 34 *et seq.* (alleging that "[t]he CPUC requires liability insurance at levels far below the minimum requirements for tax companies in San Francisco"; that "[t]he CPUC has never required [TNCs] to maintain workers'

---

[3] The Court takes judicial notice of the Phase I Decision. Judicial notice extends to the existence of the documents and the fact that the statements were made by the CPUC.

[4] Of course, the current lack of regulations on certain matter does not necessarily mean that the CPUC will not regulate the matter in the future. The CPUC regulations appear to be a work in progress.

5

compensation insurance for drivers" while "taxi companies in San Francisco are required to maintain workers compensation insurance for all drivers"; and that "[t]he CPUC does not limit the number of vehicles that [TNCs] may operate in California" whereas "the number of taxis in San Francisco is limited to 1,900").

Flywheel maintains that, "by exercising jurisdiction over some, but not all, on-demand ground transportation services [*i.e.*, services from TNCs but not services from taxi companies]," the CPUC has violated its right to equal protection. FAC ¶ 49. Flywheel "seeks a judicial declaration that the CPUC's September . . . 2013 Decision [*i.e.*, Phase I Decision] is unlawful, an injunction enjoining the CPUC from exercising jurisdiction over [TNCs] or, in the alternative, requiring that the CPUC exercise jurisdiction over all taxi companies in California." FAC ¶ 57.[5]

## II. DISCUSSION

A. Legal Standard

As indicated above, the motion pending before the Court is CPUC's motion for judgment on the pleadings or, in the alternative, for summary judgment. Because the Court does not reach the alternative request for relief, it addresses the legal standard for the former motion only.

Under Federal Rule of Civil Procedure 12(c), "a party may move for judgment on the pleadings" after the pleadings are closed "but early enough not to delay trial." Fed. R. Civ. P. 12(c12(c). A Rule 12(c) motion is "'functionally identical'" to a Rule 12(b)(6) motion to dismiss for failure to state a claim, and therefore the same legal standard applies. *Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 n.4 (9th Cir. 2011). That is, a court considers "whether the complaint's factual allegations, together with all reasonable inferences, state a plausible claim for relief." *Id.* at 1054; *see also Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009) (stating that, "[t]o survive a Rule 12(c) motion, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face") (internal quotation marks omitted); Wright *et al.*, 5C Fed. Prac. & Proc. Civ. § 1368 (pointing out that "all

---

[5] As was made clear during the prior motion-to-dismiss proceedings, Flywheel has expressly limited its challenge in this case to the selective exercise of jurisdiction by the CPUC over TNCs; it does not base its challenges on the specific differences in the content of the regulations.

6

contravening assertions in the movant's pleadings are taken to be false").

Inferences are not reasonable where "they are contrary to the clear and unambiguous words or actions of the parties or inconsistent with matters that fall within the judicial notice doctrine." *Id.* In addition, although the "moving party, for purposes of the Rule 12(c) motion, concedes the accuracy of the factual allegations in his adversary's pleading, he does not admit other assertions in the opposing party's pleading that constitute conclusions of law, legally impossible facts, or matters that would not be admissible in trial." *Id.* Finally, "[a]lthough a court will not grant a Rule 12(c) motion if a material issue of fact exists, federal judges have been firm in requiring that the issues be genuine and not based on mere pro forma denials or sham or patently false assertions in the pleadings." *Id.*

B. New Argument

As a preliminary matter, the Court notes that, at the hearing, the CPUC presented an argument that it did not expressly raise in its briefs – *i.e.*, that it is entitled to dismissal because Flywheel lacks any remedy for the alleged wrong by the agency. The CPUC pointed out that Flywheel purports to be challenging only the CPUC's decision to assert jurisdiction over TNCs. But – according to the agency – even if the Court were to conclude that the CPUC violated Flywheel's right to equal protection, Flywheel would have no remedy because the California Legislature has already deemed the agency's exercise of jurisdiction over TNCs proper. *See* Mot. at 7 (asserting that "[t]he California Legislature has since confirmed that exercise of jurisdiction [by the CPUC]"; citing Cal. Pub. Util. Code §§ 5430-44 and 2016 Cal. Legis. Serv. Ch. 740 (A.B. 1289) (West))); Reply at 1 (arguing that "[t]he California Legislature later codified that jurisdiction").

At the hearing, Flywheel disputed the CPUC's contention that the California Legislature has essentially codified the CPUC's jurisdiction over TNCs. The CPUC's position is not without some basis. For instance, California Public Utilities Code § 5440 contains legislative findings regarding oversight of the CPUC, providing that the CPUC "has initiated regulation of [TNCs] as a new category of charter-party carriers and continues to develop appropriate regulations for this new service" and that, "[g]iven the rapidly evolving [TNC] service, it is the intent of the

7

Legislature to continue ongoing oversight of the [CPUC's] regulation of these services in order to enact legislation to adjust [CPUC] authority and impose specific requirements or prohibitions as deemed necessary as these services evolve." Cal. Pub. Util. Code § 5440. Section 5441 further provides that "[t]he Legislature does not intend . . . to prohibit the [CPUC] from exercising its rulemaking authority in a manner consistent with this article, or to prohibit enforcement activities related to [TNCs]." *Id.* § 5441. On the other hand, the cited legislation does not appear to mandate the CPUC to exercise jurisdiction over TNCs. In any event, the Court need not rule on this issue – especially as it was not raised in the CPUC's papers and therefore not fully briefed. Even if the Court were to assume recent legislation does not codify the CPUC's exercise of jurisdiction and thus did not preclude it from issuing a remedy sought by Flywheel, Flywheel still would not prevail for the reasons discussed below. The CPUC is entitled to dismissal because Flywheel has not stated an equal protection violation.

C.    Equal Protection and Level of Review

> "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). To prevail on an Equal Protection claim, plaintiffs must show "that a class that is similarly situated has been treated disparately." *Christian Gospel Church, Inc. v. City & Cty. of S.F.*, 896 F.2d 1221, 1225 (9th Cir. 1990), *superseded on other grounds by* 42 U.S.C. § 2000e.
>
> "The first step in equal protection analysis is to identify the state's classification of groups." *Country Classic Dairies, Inc. v. Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988). "The groups must be comprised of similarly situated persons so that the factor motivating the alleged discrimination can be identified." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005).

*Ariz. Dream Act Coal. v. Brewer*, 818 F.3d 901, 908 (9th Cir. 2016). The groups need only be similarly situated "in all relevant respects." *Id.* at 911.

The second step in equal protection analysis "is to determine the applicable level of scrutiny." *Id.* Where no suspect or quasi-suspect class is involved and no fundamental right is burdened, rational basis review applies – *i.e.*, the government's actions must be rationally related to a legitimate governmental interest. *See Kahawaiolaa v. Norton*, 386 F.3d 1271, 1277-78 (9th

8

1  Cir. 2004) (noting that suspect classifications include race, ancestry, and alienage and that
2  fundamental rights include privacy, marriage, voting, travel, and freedom of association); *see also*
3  *Ariz. Dream Act Coalition*, 818 F.3d at 911.  Absent a basis for heightened scrutiny, as a general
4  matter,

> a law must be upheld under rational basis review "if any state of facts reasonably may be conceived to justify" the classifications imposed by the law.  This lowest level of review does not look to the actual purposes of the law.  Instead, it considers whether there is some conceivable rational purpose that [the government] could have had in mind when it enacted the law.

*SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 481 (9th Cir. 2014); *see also Fed. Commc'n. Comm'n v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (stating that, under rational basis review, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature").

To be sure, the precise level of review under the rational basis test is subject to some variation.  In some instances, the government's actual motivation and justification (not just any conceivable basis) may be explored under "'a more searching form of rational basis review.'" *SmithKline*, 740 F.3d at 481.  *See, e.g., Lawrence v. Tex.*, 539 U.S. 558, 580 (2003) (in a case addressing the validity of a state statute making it a crime for two persons of the same sex to engage in certain intimate sexual conduct, stating that, "[w]hen a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446-47, 450 (1985) (in a case addressing the validity of a zoning ordinance requiring a special use permit for homes for the mentally impaired, stating that "some objectives – such as 'a bare . . . desire to harm a politically unpopular group' – are not legitimate state interests"; adding that "requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded"); *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (in a case addressing the validity of a federal statute that excluded from participation in the food stamp program any household containing an individual unrelated to any other member of the household, stating that, "if the constitutional conception of 'equal protection

9

of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest"; legislative history for the statute indicated that it "was intended to prevent so-called 'hippies' and 'hippie communes' from participating in the food stamp program") (emphasis in original); *Animal Legal Def. Fund v. Otter*, 44 F. Supp. 3d 1009, 1026 (D. Idaho 2014) (stating that, "[t]o be rational, a law must serve a 'legitimate' end, and antipathy can never be a legitimate end").

Here, no suspect or quasi-suspect class is involved, and Flywheel does not assert a fundamental right is burdened. At the hearing, Flywheel suggested for the first time that taxi companies have been historically disfavored and subject to adverse treatment, but Flywheel's complaint alleges no facts substantiating its ipse dixit argument; nor has Flywheel cited any case authority supporting its position.[6]

Accordingly, the level of scrutiny to be applied in this case is rational review. Although Flywheel makes a passing argument to the contrary,[7] Opp'n at 9-10, the operative complaint, as

---

[6] Indeed, suspect or quasi-suspect classes often (though not necessarily) involve immutable characteristics such as race and gender. *See, e.g.*, *Adusumelli v. Steiner*, 740 F. Supp. 2d 582, 594 n.8 (S.D.N.Y. 2010) (noting that "'immutable characteristics like race, national origin, gender, and the marital status of one's parents warrant heightened scrutiny'"). Here, there is a readily mutable characteristic at issue – *i.e.*, a transportation service company's decision as to whether to accept street hails. If a taxi company were to forego the right to street hails and provide rides only on a pre-arranged basis, it might fit the definition of a charter-party carrier subject to regulation by the CPUC.

[7] Flywheel protests that animus may be inferred based on the facts alleged. Flywheel points to the concurrence in *Bishop v. Smith*, 760 F.3d 1070 (10th Cir. 2014), where Judge Holmes of the Tenth Circuit noted that

> the animus cases instruct us to explore challenged laws for signs that they are, as a *structural* matter, aberrational in a way that advantages some and disadvantages others. Two types of structural aberration [are]: (1) laws that impose wide-ranging and novel deprivations upon the disfavored group; and (2) laws that stray from the historical territory of the lawmaking sovereign just to eliminate privileges that a group would otherwise receive.

*Bishop*, 760 F.3d at 1100 (emphasis in original).

According to Flywheel, both of these structural aberrations are present in the instant case: "First, [the CPUC] imposed novel deprivations upon traditional taxi companies" by asserting jurisdiction over TNCs and regulating them but refusing to exercise jurisdiction over and regulate taxicab companies. Opp'n at 9. "Second, the CPUC strayed from its historical territory of not exercising jurisdiction over taxi companies by creating a new category, thereby eliminating the

pled, contains insufficient allegations of animus or any other factor that would justify the more searching variant of rational review, what some have called rational basis "with bite." *See Bishop*, 760 F.3d at 1099 (Holmes, J., concurring) (stating that "[s]ometimes the animus cases are said to apply 'heightened rational-basis review' or – more colorfully – 'rational basis with bite,' 'rational basis with teeth,' or 'rational basis plus'"); *see also Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012) (noting that "several courts have read the Supreme Court's recent cases in this area to suggest that rational basis review should be more demanding when there are 'historic patterns of disadvantage suffered by the group adversely affected by the statute'" – a "rational basis plus" analysis). There is nothing to suggest the CPUC's decision to assert jurisdiction over TNCs was motivated by animus against taxi companies. Indeed, the CPUC is precluded, under the California Constitution and Public Utility Code Sections discussed *supra*, from asserting jurisdiction over taxi companies.

Implicitly recognizing this, Flywheel argues that the CPUC has exhibited favoritism towards TNCs over taxi companies. But not only is there no specific factual allegation in the complaint supporting such an assertion, Flywheel has not presented any case holding that favoritism by the legislature or government agency afforded to one segment of commerce over another is equivalent to legislation motivated by animus. *See, e.g.*, *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 654 (7th Cir. 2013) (stating that, "[f]or our purposes, animus only invalidates a law when no rational basis exists"; adding that, "[a]s unfortunate as it may be, political favoritism is a frequent aspect of legislative action"). Animus is ill will or hostility, *see* Black's Law Dictionary at 97 (8th ed. 2004), and is not simply the converse of favoritism towards

---

privileges that [Flywheel] would ordinarily have – namely a market where all taxi companies are subject to the same regulations meant to benefit consumers and the community." Opp'n at 9-10. Neither of these arguments, however, is convincing. There is no wide-ranging and novel deprivation here; rather, taxicab companies are being regulated as they always have. Furthermore, there is no straying from historical territory; the CPUC cannot exercise jurisdiction over taxicab companies by the express terms of the California Public Utilities Code, and, per the definition of a TNC, TNCs, unlike taxicabs, operate on a prearrangement basis only (*i.e.*, no street hails). *See* Cal. Pub. Util. Code § 5431(a) (defining TNC has a company "that provides prearranged transportation services for compensation using an online-enabled application or platform to connect passengers with drivers using a personal vehicle"); *see also* RJN, Ex. N (Phase I Decision at 2) (same).

another. As the Court noted at the hearing, legislators often favors one industry or segment of commerce over another; yet such economic regulation is historically the kind of legislation that is subject to the most deferential form of traditional rational basis review under the Equal Protection Clause. *See, e.g.*, *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483 (1955) (upholding state regulation on visual care that distinguished between ophthalmologists/optometrists and opticians); *Executive 100 v. Martin County*, 922 F.2d 1536, 1541 (11th Cir. 1991) (citing *Lee Optical* for the proposition that, "[i]n cases involving economic regulation, the courts apply the rational basis test"); *see also Dandridge v. Williams*, 397 U.S. 471, 485 (1970) (noting that, "[i]n the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect[;] [i]f the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality'"). Simply put, Flywheel has not offered any authority establishing that favoring one part of an industry amounts to disfavoring another out of malice or spite. Accordingly, traditional rational basis review applies.

D.  Traditional Rational Basis Review

For purposes of this opinion, the Court assumes that taxis and TNCs are sufficiently similarly situated for step one of the equal protection analysis. Turning to step two, as discussed above, the Court, in applying traditional rational basis review, simply inquires whether there is "any reasonably conceivable set of facts" justifying the disparate treatment. As stated by the Supreme Court, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. Where there are 'plausible reasons' for Congress' action, 'our inquiry is at an end.'" *FCC v. Beach Commun's*, 508 U.S. 307, 313-14 (1993).

Here, there is a reasonably conceivable set of facts that justify the CPUC's decision to differentiate between taxis and TNCs. More specifically, the CPUC defined "TNC" as a company "that provides prearranged transportation services for compensation using an online-enabled application (app) or platform to connect passengers with drivers using their personal vehicles."

12

1 RJN, Ex. N (Phase I Decision at 2); *see also* Cal. Pub. Util. Code § 5431(a) (same). This means
2 that, unlike a taxi, "[a] TNC shall *not* be permitted to accept street hails." RJN, Ex. N (Phase I
3 Decision at 68) (emphasis added). In a street-hail situation, a passenger is (as a general matter)
4 more likely to be in a vulnerable position compared to a passenger who prearranges a ride. That
5 is, in a street-hail situation, the passenger typically has an immediate need for transportation
6 services and therefore, in a more vulnerable position, lacks the assurances that come with a pre-
7 arranged ride. Thus, there is a conceivable basis for a differential approach to regulation,
8 including, *e.g.*, closer regulation of rates and imposition of requirements for taxis. Significantly,
9 other courts have recognized the basis for such distinction.

For example, in *Illinois Transportation Trade Association v. City of Chicago*, 839 F.3d 594, 598 (7th Cir. 2016), Judge Posner of the Seventh Circuit noted that "[t]axis but not TNPs are permitted to take on as passengers persons who hail them on the street" and so "it makes sense . . . for the City to try to protect passengers by screening the taxi drivers to assure that they're competent and by imposing a uniform set of rates based on time or distance or both"). The plaintiffs included companies that own and operate taxicabs. The plaintiffs filed suit against the city of Chicago because it had developed ordinances to regulate TNCs (or, as referred to in the opinion, TNPs for transportation network providers) , but those ordinances were different from and more permissive than those regulating taxi companies. One of the claims asserted by the plaintiffs was an equal protection claim. The district court held that the claim "had sufficient potential merit to survive a motion to dismiss" – *i.e.*, "the City, by failing to place as many regulatory burdens on the TNPs as on the taxicab companies, might have denied the latter the equal protection of the law." *Id.* at 598. The Seventh Circuit disagreed, holding that the City had made out "a compelling case" that "the regulatory differences between Chicago taxicabs and Chicago TNPs are . . . defensible." *Id.*

> Taxis but not TNPs are permitted to take on as passengers persons who hail them on the street. Rarely will the passenger have a prior relationship with the driver, and often not with the taxicab company either; and it makes sense therefore for the City to try to protect passengers by screening the taxi drivers to assure that they're competent and by imposing a uniform system of rates based on time or distance or both. So taxi service is regulated by the City of

13

> Chicago, but so is TNP service, though differently because the service is different from taxi service. A major difference is that customers, rather than being able to hail an Uber car, must sign up with Uber before being able to summon it, and the sign up creates a contractual relationship specifying such terms as fares, driver qualifications, insurance, and any special need of the potential customer owing to his or her having a disability. Unlike taxicab service Uber assumes primary responsibility for screening potential drivers and hiring only those found to be qualified, and the passengers receive more information in advance about their prospective rides – information that includes not only the driver's name but also pictures of him (or her) and of the car. Furthermore, the TNPs use part-time drivers extensively, and it is believed that these part-timers drive their cars fewer miles on average than taxicab drivers, who are constantly patrolling the streets in hope of being hailed; and the fewer miles driven the less likely a vehicle is to experience wear and tear that may impair the comfort of a ride in it and even increase the risk of an accident or a breakdown.

*Id.* The Seventh Circuit added that

> [d]ifferent products or services do not as a matter of constitutional law, and indeed of common sense, always require identical regulatory rules. The fallacy in the district judge's equal protection analysis is her equating her personal belief that there are no significant differences between taxi and TNP service with the perception of many consumers that there are such differences – a perception based on commonplace concerns with convenience, rather than on discriminatory or otherwise invidious hostility to taxicabs or their drivers. If all consumers thought the services were identical and that there was therefore no advantage to having a choice between them, TNPs could never have gotten established in Chicago.

*Id.* at 598-99; *see also Gebresalassie v. Dist. of Columbia*, 170 F. Supp. 3d 52, 61-62 (D.D.C. 2016) (noting that "taxicabs are the *only* vehicles-for-hire available for street hail" and that "it is impractical to attempt to negotiate with several taxicabs while hailing one on the street") (emphasis in original); *Joe Sanfelippo Cabs Inc. v. City of Milwaukee*, 46 F. Supp. 3d 888, 893 (E.D. Wis. 2014) (noting that the TNC/ride-share model provides for a "pre-ride fixed price agreement and [an] electronic record of the agreement [which] protects consumers[;] [i]n contrast, when a consumer hails a cab on the street or calls a cab by telephone, she is not similarly protected" because "[e]ven if a passenger and driver orally agreed on a fixed price before the ride began, there would be no record of that agreement [and so] metered fares are still needed to protect consumers in certain situations").

To be sure, one federal district court has ruled – at least to a certain extent – in favor of

14

traditional taxi companies. *See Boston Taxi Owners Ass'n v. City of Boston*, 180 F. Supp. 3d 108 (D. Mass. 2016), *available at* 2016 U.S. Dist. LEXIS 43496, at *17-18 (denying motion to dismiss because plaintiffs plausibly argued that, while the city offered a legitimate government objective – an "interest in increasing the availability and accessibility of cost-effective transportation" – it was not "rationally related to any distinction between taxi operators and TNCs"; "[t]hat is, the distinctions between taxicab operators and TNCs cited by the City, such as differences in the kind of vehicle and payment methods used, are unrelated to the City's policy objective"). However, the better and current weight of authority lies against Flywheel.

At the hearing, Flywheel contended that, as a factual matter, TNCs, like taxis, do in fact take street hails – or at least they did so back in September 2013 when the CPUC decided to exercise jurisdiction over TNCs. But that is not clearly alleged in the operative complaint. *See, e.g.*, FAC ¶ 15 ("Presently, UberX and Lyft provide on-demand ground transportation services in San Francisco that are requested through smartphone applications *and/or* street hails.") (emphasis added); FAC ¶ 27 ("Both *de facto* taxis companies [*i.e.*, TNCs] and taxi companies . . . provide on-demand ground transportation services within the City of San Francisco with rides summoned through street *or* smart-phone hails.") (emphasis added). And even if such allegation could fairly be inferred from the complaint, that is largely beside the point. The CPUC defined TNCs as *not* accepting street hails, *see* RJN, Ex. N (Phase I Decision at 68) (stating that "[a] TNC shall not be permitted to accept street hails"), which makes sense because the whole business model underlying companies such as Uber and Lyft is to make use of a smartphone application which requires prearrangement. Flywheel has made no allegation that it was part of the business model of TNCs to accept street hails or that it was such a prevalent informal practice that the CPUC's understanding of TNCs as requiring prearrangement was not accurate.[8] To the extent Flywheel suggests that it needs to take discovery to find out whether TNCs regularly accepted street hails, it is putting the cart before the horse. Flywheel must first have a good faith basis (consistent with

---

[8] Flywheel does not contend, nor could it, that evidence of isolated incidents of responding to street hails contrary to the policies of TNCs would undermine the CPUC's assertion of jurisdiction.

1  Federal Rule of Civil Procedure 11) to make that allegation, and only then (if there is a plausible
2  claim) is it entitled to discovery.
3        Accordingly, the Court concludes that, under traditional rational review, the CPUC's
4  decision to assert jurisdiction over TNCs but not taxi companies did not violate Flywheel's
5  constitutional right to equal protection.

E.    Amendment

      The only issue remaining is whether the Court should give Flywheel leave to amend its complaint in challenging the CPUC's decision to exercise jurisdiction over TNCs. The Court finds that, under traditional rational review, amendment would be futile. The CPUC's actions are constitutional so long as there is any reasonably conceivable set of facts justifying the disparate treatment, and, as discussed above, that standard has been met.

      Implicitly recognizing such, Flywheel argues that it should be permitted to amend so as to include allegations that would give rise to rational review "with bite." But here as well there is a futility problem. As Flywheel recognizes, for rational review "with bite" to obtain, there must be allegations supporting, *e.g.*, an inference of animus on the part of the CPUC. However, both in its papers and at the hearing, Flywheel failed to articulate any basis for asserting such animus.

      At the hearing, for example, Flywheel argued that animus against it or traditional taxi companies generally may be inferred from the fact that TNCs such as Uber and Lyft were favored by the CPUC. But as noted above, Flywheel has failed to cite to any authority showing that animus may be inferred from favoritism, particularly in the area of economic regulation and where no suspect class or fundamental right is at issue. Even assuming that the CPUC favored TNCs, without more, it cannot be plausibly inferred that the agency therefore bore ill will or hostility to traditional taxi companies – *i.e.*, that it desired to harm them. *Cf. City of New Orleans v. Dukes*, 427 U.S. 297, 303-04 (1976) (per curiam) (stating that, "[w]hen local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations"; further stating that, "in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment").

16

Flywheel also insinuated at the hearing that the CPUC favored TNCs such as Uber and Lyft because the companies may have given bribes to the agency or otherwise illegally influenced it. But there are several problems with this theory. First, Flywheel has not asserted there are any specific facts that would suggest any such untoward action was taken by TNCs. At the hearing, Flywheel pointed to publicly known bribery allegations involving former CPUC President Peevey, but they did not involve TNCs. Nor does Flywheel explain how the remaining commissioners would similarly be plagued by bribery charges or that Mr. Peevey had undue influence over the other commissioners. Flywheel argues given the publicly known problems with Mr. Peevey, it is entitled to take discovery on TNCs' influence, but, as above, Flywheel puts the cart before the horse. Before discovery may be undertaken, there must first be a plausible basis for Flywheel's claim. It has provided or proffered any such plausible basis.

### III.   CONCLUSION

For the foregoing reasons, the CPUC's motion for judgment on the pleadings is granted. Flywheel does not have leave to amend because amendment to a complaint challenging under the equal protection clause the CPUC's exercise of jurisdiction over TNCs but not taxi companies would be futile.[9]

The Clerk of the Court is directed to enter judgment in accordance with this opinion and close the file in this case.

This order disposes of Docket No. 53.

**IT IS SO ORDERED**.

Dated: January 12, 2017

EDWARD M. CHEN
United States District Judge

---

[9] Again, Flywheel does not challenge herein the specific content of regulations on an equal protection basis.

17